### THE ALICE SHERIDAN.

### THE DORIS B.

### THE GOVERNORS ISLAND

### SWENSON v. GREAT EASTERN FUEL CO., Inc., et al.

### M. & J. TRACY, Inc., v. PENNSYLVANIA R. CO. et al.

#### Nos. A–16638, A–16588.

District Court, E. D. New York.

Dec. 2, 1943.

Mahar & Mason, of New York City (Frank C. Mason and Walter E. Lawlor, both of New York City, of counsel), for libelant Swenson.

Macklin, Brown, Lenahan & Speer, of New York City (Gerald J. McKernan, of New York City, of counsel), for libelant M. & J. Tracy, Inc.

Dorsey, Adams & Walker, of New York City (James F. Hart, of New York City, of counsel), for Great Eastern Fuel Co., Inc.

Burlingham, Veeder, Clark & Hupper, of New York City (Stanley R. Wright, of New York City, of counsel), for Pennsylvania R. Co.

BYERS, District Judge.

These causes involve a collision between the barges Alice Sheridan and Governors Island, in Arthur Kill on April 29, 1942, at about 8:20 a.m.

The former, loaded with coal, was moving northerly, being the only vessel in tow of the Diesel tug Doris B.

The Governors Island was one of a 15-barge light fleet moving southerly in tow of The Pennsylvania Railroad Company's steamtug Amboy, assisted by the Diesel tug Wicomico.

The Governors Island was the fifth vessel on the starboard side of the light tow, which was made up three abreast. There were four barges on the port side, five in the middle of the tow, and six on the starboard side. The somewhat irregular conformation was the result of the addition of four barges to the fleet at Elizabethport, the original number leaving New York having been eleven, and the destination being South Amboy. The added barges were the Birch, Governors Island, and Eureka No. 97 in that order on the starboard side, and the Glen Island being the fifth barge added to the middle line or file.

Since these vessels were not of uniform length, the tiers were not laterally even, astern of the third; the Birch, being the fourth starboard barge, protruded ahead of the stern of the vessel to her own port, and extended aft of the bows of the port side and middle barges in the fourth tier on the port side; the Governors Island (starboard fifth) lapped the vessels to her own port in the middle line, that is, the fourth, which was the Eureka No. 100, and the fifth, the Glen Island; her stern extended aft of the bow of the latter in the middle line, while the Eureka No. 97 trailed after the Governors Island, which was made fast to the Birch just ahead, and the Eureka No. 97 astern, and the latter was held to the Glen Island by a breast line.

The fore and aft lines on the Governors Island being accounted for, it is required to ascertain how she was made fast to port.

De Naer, her captain, says: "I was tied up to his (Eureka No. 100) quarter cleat with a breast line * * *." and that statement is not contradicted.

Also the Eureka No. 97 was held by a line from the Glen Island, as her captain related. Thus by her own direct connection, and the indirect one leading through the Eureka No. 97 to the Glen Island, the Governors Island was not free to move out laterally to her own starboard hand and away from the flotilla, as argued for Tracy in the second cause.

The foregoing is derived from the testimony as a whole, and not because it was completely or clearly shown in any one place. For instance, Penn.Ex.1 is in error

according to the testimony, in showing a breast line between the Governors Island and the Glen Island.

The two causes were tried together by consent, and should be explained:

## A-16638

By libel filed October 22, 1942, Walter Swenson, as owner of the barge Alice Sheridan, sued the Great Eastern Fuel Co., Inc., as charterer of the said barge, alleging her delivery in good condition on March 1, 1942, and her return on April 30, 1942, in a damaged condition not caused by ordinary wear and tear.

On December 1, 1942, the said respondent filed an answer, and a petition impleading The Pennsylvania Railroad Company, the owner and operator of the tug Amboy, and these pleadings were amended under date of February 10, 1943.

On March 11, 1943, the impleaded respondent filed answers to the petition and to the libel, and in the former the collision in question was set forth, and sole fault therefor was alleged to be on the part of the tug Doris B; on the same date the impleaded respondent filed a petition impleading the said tug Doris B, and prayed that the libel be dismissed as against The Pennsylvania Railroad Company, and that the impleaded tug be the subject of proceedings in the suit for damages initiated by the libel. Process issued pursuant to the prayer of that petition, and the tug Doris B was arrested by the Marshal, and it appears that she was not claimed, and consequently the tug is in default in this cause.

## A-16588

M. & J. Tracy, Inc., as owner of the barge Governors Island, under date of August 5, 1942, filed a libel against The Pennsylvania Railroad Company, the tugs Amboy and Wicomico, and the tug Doris B, alleging that the Governors Island was towed from New York to Perth Amboy under contract with The Pennsylvania Railroad Company, which caused the tugs Amboy and Wicomico to take the Governors Island with other barges in tow as has been stated; that the tow was improperly made up, and negligently was caused and allowed to come into contact with another tow (i.e., the Doris B and Alice Sheridan) whereby the Governors Island was damaged solely because of the fault of the Railroad Company, its tugs, and the Doris B.

The Amboy and Wicomico were duly claimed by the Railroad Company, but the arrest of the Doris B at the instance of the owner of the Governors Island did not result in any claim's being made by the owners of the Doris B.

The answer of The Pennsylvania Railroad Company was filed in this cause also on March 11, 1943, and is to the effect that the Doris B was solely responsible for the said collision.

A single and clear issue of fact emerges from this somewhat elaborate procedural pattern, namely: Who was at fault for the collision?

Tracy Exhibit 1 is a chart of the waters where the collision occurred, and reveals that in this area there is a width of channel of 450 feet, referring to that part of Arthur Kill which lies between the B. & O. Railroad bridge to the north and the Gulfport property on Staten Island, which extends well to the south of the bend later to be mentioned. The Bayway docks on the Jersey side of the Kill, where it makes a turn to the northeast, lie above Gulfport, and the collision is found to have occurred in the waters lying between, at about 300 yards below the Goethal's bridge at somewhat north of the center of the channel.

The physical conditions were agreed to, namely, the weather was fair; the tide was the last of the flood, i.e., it flowed northerly through the Arthur Kill of a strength not to exceed one mile; the wind was out of the south or southwest, and of a force not to exceed fifteen miles.

The Diesel tug Doris B is 42.9 feet long by 14.2 feet in beam, and has a depth of 6.5 feet, and 135 horse power, and was under charter to the Great Eastern Fuel Co., Inc., on the date of the occurrence.

The Alice Sheridan is a wooden coal barge, 102.7 feet long by 29.3 feet in beam, and has a depth of 11.9 feet, and she was loaded with 495 tons of coal, about two-thirds of her capacity.

The Doris B was towing the Alice Sheridan on a single hawser and bridle of the combined length of 90 feet.

The steamtug Amboy is of 1200 horse power, but her dimensions seem not to have been given. At the end of 30 fathoms of hawser, she was towing the flotilla of 15 light barges which has been described. The dimensions of the barges are not given, which makes it impossible to state the length of the tow, but the decision will

proceed upon the theory that the tow was about 105 feet wide in the first, second, third and fourth tiers, and not to exceed 110 feet wide in the fifth tier, and that it was about 900 feet long, measured from the bow of the Amboy to the stern of the Eureka No. 97.

Since there is no dispute about the charter of the Alice Sheridan and the damage sustained by it, the court hereby finds that the allegations in the Swenson libel are sustained, and that the damage to the Alice Sheridan resulted from the collision in question and was not due to ordinary wear and tear during the period of charter hire.

The Pennsylvania tow, proceeding down the Arthur Kill, passed under the Staten Island draw of the B. & O. bridge, and perceiving no reason to the contrary, held to the port side of the channel on its way down, which is found to have been proper and in accordance with custom, since there was no water-borne traffic to be considered. Shortly after emerging from the draw, the Amboy observed the Doris B at a distance of about 1500 feet as she was about to round the bend above referred to, proceeding in a northerly direction in the center of the channel.

It is found that the Amboy tow was moving at the rate of about 7 miles an hour, and the Doris B at about half of that speed. The Amboy blew two whistles for a starboard passing, and observing no answer from the Diesel tug, after a short interval repeated the two-blast signal, and again heard no response; it appeared that the starboard passing had been agreed to, since the Doris B did nothing to indicate the contrary, and soon the tugs were abreast, and at that time the captain of the Amboy called to the captain of the Doris B to move over in the channel and give way. Almost at once the Amboy blew an alarm, because of the apprehension of danger on the part of her captain.

It will be seen that the Doris B in rounding Gulfport would be required to change her heading to her own starboard (as to this, see the original petition of Great Eastern Fuel Co.), in order to avoid running into the Bayway docks, and it is gathered from the testimony that she did so, which would make her course parallel to the center of the channel and cause the barge that she was towing to swing to port; that would have to be done soon enough so that the swing would be completed by the time when the Sheridan would have to pass the tail of the Amboy tow; from the Amboy it might look as though the Doris B was holding too much off the Bayway docks, but she was required to take the course which has been stated, in order to round Gulfport.

The combined speed of the tows meant that they were bound to be abreast in a short space of time after coming mutually into sight, and it is necessary to pause long enough to state that the two-blast signal blown by the Amboy was promptly observed by the Doris B, and answered with a two-blast signal, so that there was no misunderstanding on the part of the two navigators concerning the starboard passing; however, the Doris B failed to take into account the necessary delay on the part of the Alice Sheridan in lining up straight behind when the turn referred to should have been completed, with the result that the Alice Sheridan came too close to the tail of the Amboy tow to admit of clearance.

The descending tow could not maintain a straight course, because immediately below the Goethal's bridge the Amboy was required to turn slightly to her own starboard and then to her port hand in rounding Gulfport, which meant that, as the rounding was made, the tail of the Amboy tow would necessarily incline to its own starboard; thus the latter element would swing over beyond the center of the channel and tend to approach the Jersey shore just above or off the Bayway docks.

These conditions should have been apparent to the navigators of both tugs.

It should be said for the Amboy tow that the Wicomico, the helper tug, was made fast to the fourth barge on the port side with a headline, but the tug did not act as a drag, since her own engines were kept turning sufficiently to keep her in head motion. Her office was to prevent the port side of the tow from crowding the Staten Island shore after emerging from under the B. & O. draw; it was not necessary for her to function except passively in that connection, but when the alarm was blown on the Amboy so that the Wicomico was made aware that something was amiss on the starboard side of the tow, her headline was passed back to her quarter cleat and she took a strain on that line with the object of holding her side of the tow close to the Staten Island shore.

It will be seen that the combined widths of these tows could not exceed 150 feet, so that in a stretch of water 450 feet wide there were 300 feet in which passing could be safely accomplished, and it is reasonably clear that there would have been no contact whatever but for the necessary changes in the courses of the two tows as they approached, which it has been the effort to describe, and the failure of the upbound tow to navigate so as to accomplish a starboard passing.

Naturally the Amboy tow was the more cumbersome of the two, and the more difficult to handle, which could have been readily observed and understood by the Doris B; while much is sought to be made of the fact that the Governors Island was wider than the Birch which lay just ahead, by a matter of 6 feet, and therefore protruded 3 feet beyond the latter's starboard side, nothing in the testimony would justify a finding that this constituted a fault in the makeup of the tow. As has been stated, she was one of four barges which were added to the tow as originally constituted, and no one suggests that there was any requirement on the part of the Amboy or her helper to break up the tow and reassemble it so as to put the Governors Island in the first tier by reason of her beam.

To resume the narrative, the Alice Sheridan was towed so that she safely passed the first three tiers of the Amboy tow, but the starboard stern of the Sheridan struck and brushed along the starboard side aft of the Birch, shoving her somewhat to port and causing the Governors Island to kink somewhat to starboard, since there was a space of about 10 feet between the Birch and the Governors Island; the Sheridan's starboard bow corner struck the latter at about 7 feet in from her own starboard corner, on the bow, causing the damage in question.

As has been stated, the shape of the Amboy tow necessarily followed the contour of the Kill below the B. & O. and the Goethal's bridges, which means that there was a certain inclination on the part of the end barges to their own starboard when rounding Gulfport, which probably explains some of the testimony of the various witnesses concerning the distance of those barges (75 to 100 feet) from the Jersey shore at the time of the collision.

I was impressed by the remark (on cross-examination) of one of the Tracy witnesses, Maurice De Naer, not in their employ at the time of the trial, who was the bargee of the Governors Island, as follows:

"Q. Did it take you five minutes to get the coal? (for use in his stove) A. No, but I seen the tow coming with one boat and that is why I was watching them.

"Q. He was heading right for you? A. Yes, sir.

"Q. Apparently making no effort to pull off to port? A. He tried to go out again, but he was too late and he was right along by the Birch.

"* * *

"Q. At the moment of the collision, at the time the Sheridan hit your bow was the little Diesel tug (Doris B) heading toward Jersey or down the channel? A. He was going on the Jersey side a little bit.

"Q. Was he near any other vessels? A. No, sir.

"Q. There was nothing to interfere with the Doris B hauling further to her port? A. If he was watching the way he was going and had kept on the Jersey side that never would have happened."

■ The testimony of Blackler, the captain of the Doris B, was quite confusing as to the course he followed, and created the impression that he did not realize soon enough the necessity for holding close to the Jersey shore after he had accepted the two-whistle signal, which may have been due to his failure to realize the speed of the oncoming Pennsylvania tow; whatever the reason was, I am satisfied, as is De Naer, that if the Doris B had been properly maneuvered the collision would not have occurred. Perhaps Blackler's vacillating narrative on the stand is not wholly unrelated to the change in the recitals between the original and the amended petitions in the first cause.

It seems clear that the Doris B did not head toward the Jersey shore soon enough to carry out her two-whistle agreement, and that she could have done so if properly navigated, despite the necessity for rounding Gulfport so as to keep the Alice Sheridan from contact with the Bayway docks.

Much is sought to be made of the fact that after the alarm the Amboy's engines were stopped for a short time and then were kept "tripping", namely, enough motion was preserved to keep the hawsers from fouling the propellers. At that time

850

the Amboy was heading toward the Bayway docks, but that position, I am satisfied, did not cause the tail of the Amboy tow to sag over, any more than the shape of the Kill had already induced. The strain on the Wicomico line, which has been described, counteracted such tendency.

Upon the evidence as a whole, it is concluded that in the first cause the libelant is entitled to a decree against the Great Eastern Fuel Company, as respondent, with costs, and that the impleading petition against The Pennsylvania Railroad Company should be dismissed with costs, and that the impleading petition against the tug Doris B should result in a decree against the Doris B with costs; and that in the second cause, the libel of the owner of the Governors Island should be dismissed as against The Pennsylvania Railroad Company and the tugs Amboy and Wicomico without costs, and that there should be a decree in favor of Tracy against the Doris B with costs.

Settle decree and findings if desired.